UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>**ARTSTOCK d/b/a**<br>**Artist & Craftsman Supply,**<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 25-20305 |

**DECLARATION OF GLENN L. DAVIS**
**IN SUPPORT OF FIRST DAY MOTIONS**

I, Glenn L. Davis, am over eighteen years of age, and competent to testify on these matters, hereby declare, depose and state, based upon my personal knowledge, information and belief as follows:

1. I am the Chief Financial Officer of Artstock d/b/a Artist & Craftsman Supply (the "**Debtor**").

2. The Debtor was founded in 1985 as a small art supply store in Portland, Maine focused primarily on fine art materials and serving local artists. Starting in the mid-1990s, the Debtor began expanding its retail footprint beyond its original store and the company expanded into areas beyond traditional fine art, including children's art supplies, school materials, novelty items, and eclectic goods.

3. Over time, the Debtor grew into one of the largest independent art material retail chains in the United States with dozens of brick-and-mortar locations across multiple states and a strong online presence. Unfortunately, recent economic headwinds and unyielding lending restrictions have put a severe a strain on the Debtor's finances, necessitating this filing.

---

[1] The last four digits of Artstock's federal taxpayer identification number are 6772, and its principal place of business is 540 Deering Avenue, Portland, Maine.

4. Accordingly, on December 21, 2025 (the "**Petition Date**"), the Debtor commenced its chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

5. The Debtor continues to operate its business and manage its property as debtor and debtor-in-possession. To date, no operating trustee, examiner, or statutory committee has been appointed in the case by the Office of the United States Trustee.

6. As the Chief Financial Officer of the Debtor, I have personal knowledge of the facts and circumstances of Debtor's business affairs and reorganization efforts, which includes personal knowledge of the accuracy of the facts and circumstances set forth at length in the first day motions that have been filed with the Court including but not limited to the following facts:

*Facts Supporting the Bank Accounts Motion*

7. Immediately prior to the Petition Date, the Debtor maintained a number of different accounts relating to the eighteen (18) store locations of the Debtor. These various accounts, which are held at different banks throughout the country, through the Debtor's business operations, ultimately consolidate proceeds in accounts at Cambridge. The Debtor's bank account structure is set forth in **Exhibit A**, which is attached to the Bank Accounts Motion and incorporated herein by reference.

8. As reflected in **Exhibit A**, the Debtor operates a complex and well-developed cash management system (the "**Cash Management System**") that enables the Debtor to collect and disburse cash in an efficient, controlled, and well-organized manner across its stores. The Cash Management System consists of multiple accounts (the "**Accounts**") located at Cambridge and other financial institutions (including various store-specific deposit accounts). The Accounts

facilitate the timely collection, concentration, management, tracking, and disbursement of funds by the Debtor in the ordinary course of its business.

9. One of the Accounts is a lockbox account (the "**Lockbox**") at Cambridge for the receipt of payments from various sources to the Debtor. The Lockbox is swept daily, and, prepetition, certain of the collected funds held in the Lockbox were transferred to pay the revolving loan (the "**Line of Credit**") and other fees and amounts owed to Cambridge, each as provided under various loan documents with Cambridge. The payments made to Cambridge under the Lockbox arrangement provide the Debtor with additional availability under the Line of Credit, which availability was used prepetition to fund the Debtor's operating and other expenses.

10. In addition to the Accounts, in the ordinary course of business, the Debtor uses a variety of business forms, including, but not limited to, various check types, correspondence letterhead, purchase orders, and invoices (collectively, the "**Business Forms**"). System-generated sequenced check numbers are printed on stock as checks are printed. To minimize administrative expense and delay, the Debtor requests authority to continue to use its Business Forms substantially in the forms existing immediately prior to the Petition Date, until such time as the Debtor can establish and transition to new forms.

11. By the Bank Accounts Motion, the Debtor seeks the entry of an interim and then final order authorizing the Debtor to: (a) continue using the existing Cash Management System on an interim basis for approximately 30 days and then on a final basis to the extent required thereafter; (b) maintain the Accounts on an interim basis for approximately 30 days and then on a final basis to the extent required thereafter; and (c) continue using the Business Forms until depleted in the ordinary course.

12. The Debtor further requests authority to deposit funds in, and withdraw funds from,

all such Accounts, including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers, and other debits, and to treat the Accounts for all purposes as "debtor-in-possession accounts" until such time as the Debtor is able to replace those accounts with debtor in possession accounts at an authorized financial institution ("**DIP Accounts**")—with a full reservation of rights by the Debtor to seek a longer extension or authority to use some or all of the Accounts as "debtor-in-possession accounts" on a permanent basis following a final hearing.

13. Finally, the Debtor seeks entry of an order directing Cambridge to provide access to all Accounts at Cambridge, including the Lockbox, so that Debtor can access the revenues generated by its normal business operations and disburse such funds in accordance with its duties as debtor-in-possession and other applicable Court orders.

14. The Debtor submits that no parties in interest will be harmed by the continued use of the Accounts because the Debtor will implement appropriate mechanisms to ensure that the Debtor will not make unauthorized payments on account of prepetition obligations. In addition, parties in interest and the U.S. Trustee can adequately monitor the flow of funds into and out of the Accounts through the required monthly operating reports or such other reporting as may be required or ordered in this case, all of which will reflect transactions in the Accounts. In light of such protective measures and the disclosure obligations, the Debtor submits that the relief requested herein is in the best interests of the estate and creditors, and that compliance with the UST Guidelines would be unnecessary and inefficient.

*Facts Supporting Payroll Motion*

15. As of the Petition Date, the Debtor had 119 full-time employees and 19 part-time employees (collectively, the "**Employees**"). Of the Employees, 107 are paid on an hourly basis and 31 are salaried.

16. The Employees are paid every week, on Friday, for their services in the preceding one-week period of Monday to Sunday, with the funds required to satisfy the payroll obligations drawn from the Debtor's account on Thursday of each week. The Debtor's first post-petition payroll disbursement date will be December 26, 2025.[2]

17. Payroll is funded and managed through ADP as the payroll company (the "**Payroll Company**"). The Debtor pays the Payroll Company a monthly service fee averaging **$3,267** per month (as may vary from week to week based on the number of Employees in the applicable period, the "**Payroll Fee**").

18. The Employees hold various positions for the Debtor that are critical to Debtor's ongoing operations and ability to meet its obligations as debtor-in-possession. Those positions include roles related to operations, accounting, sales, inventory management and shipment fulfillment. The Employees' skills, knowledge, and understanding of the Debtor's business, products, and general operations, are essential to the effective operation of the Debtor's business and to successful, value-maximizing strategies in the Debtor's chapter 11 case.

19. Further, just as the Debtor depends on the Employees to operate its business on a daily basis, the Employees also depend on the Debtor. The Debtor understands that many of these individuals and their families rely on payments received from the Debtor for their basic living necessities. In an effort to minimize the personal hardship to the individuals and to maintain morale and stability in the Debtor's business operations during this critical juncture, the Debtor seeks authority to continue to pay and honor (subject to applicable Orders of this Court and the Bankruptcy Code) amounts arising under or in connection with the Debtor's pre-petition obligations to the Employees, all as set forth in more detail in the Payroll Motion.

---

[2] Due to the Christmas holiday on December 25, 2025, the Debtor anticipates that funds will be drawn on December 24, 2025, for the December 26 payroll date.

20. The Debtor is responsible for wage and salary obligations to its Employees. The Employees are owed and have accrued various prepetition payroll payments that were not yet paid or otherwise realized in the ordinary course as of the Petition Date. The Debtor is not, at this time, requesting authority to pay any Employee an amount exceeding the amount entitled to priority under § 507(a)(4) of the Bankruptcy Code. The Debtor does not seek to modify the amount of compensation paid to any "insider" of the Debtor through this Motion.

21. As of the Petition Date, the Employees were owed and had accrued various sums for wages as set forth above for pre-Petition Date services (the "**Employee Compensation Obligations**"). The Debtor is able to estimate the amounts owed to the Employees based on payroll amounts for prior payroll periods. Specifically, average gross wages in recent weeks were approximately **$115,000.00** (and approximately **$123,500.00** with employer-side taxes), which is composed of approximately **$65,000.00** for hourly Employees and **$50,000.00** for salaried Employees.[3] Because each payroll distribution is for services previously provided in the prior one week, a pro rata portion of the Employee Compensation Obligations paid after the Petition Date will constitute compensation for prepetition services.

22. The Debtor also withholds taxes and other withholdings from wages and salaries as required by federal, state, and local laws. In particular, these laws require the Debtor to withhold amounts related to federal and state income taxes, Social Security and Medicare taxes, and certain wage garnishments for remittance to the appropriate federal, state, or local authorities, or other third parties (collectively, the "**Withheld Amounts**"). The Debtor also is required to pay additional amounts for the employers' contributions to Social Security and Medicare taxes (such taxes and withholdings, together with the Withheld Amounts, the "**Payroll Taxes**"). A portion of

---

[3] The Debtor will provide a copy of the payroll register to the Office of the United States Trustee for the pre-petition period consistent with the relief sought herein.

6

the Payroll Taxes will relate to prepetition services for the reasons set forth herein.

23.   In addition, the Debtor provides the following benefits to eligible Employees (such benefit programs, the "**Employee Benefit Programs**" and the Debtor's payment obligations in providing the Employee Benefit Programs to eligible Employees, the "**Benefit Obligations**"):

(a) Health insurance provided through Bavvy, with the Debtor funding **60%** of the premiums for such coverage for eligible Employees;

(b) Dental and Vision insurance through Cigna Insurance, with the Debtor funding **60%** of the premiums for such coverage for eligible Employees;

(c) Life insurance through Mutual of Omaha, with the Debtor paying for **$50,000** life insurance benefits for eligible Employees with anything extra at the Employee's expense;

(d) Voluntary plans through Colonial Life at the Employee's expense: Short Term Disability, Cancer, Accident, Life and Term Life;

(e) Effective January 1, 2026, the following voluntary plans at the Employee's expense: Critical Illness, Accident Insurance, and Hospital Indemnity through Mutual of Omaha;

(f) Reimbursement to eligible Employees for purchases made by eligible Employees on behalf of the Debtor in the ordinary course, which amount is de minimis and funded through accounts payable; and

(g) 401(k) program with the Debtor matching 0% of contributions.

24.   The Employee Compensation Obligations, the Payroll Fee, the Payroll Taxes, and the Benefit Obligations are collectively referred to herein as the "**Payroll Obligations**."

25.   The Debtor, in the ordinary course, maintains the following insurance coverage necessary to operate its business and protect the property of the estate, and pursuant to which the Debtor is required to fund certain premiums and other obligations, a portion of which may include prepetition obligations and periods due to the timing of coverage and invoicing after the Petition Date (collectively, the "**Insurance Obligations**"):

- **Workers' Compensation Insurance** – Travelers (covers employee workplace injuries);

7

- **Commercial Package** – Travelers (covers property and liability and is comprised of the General Liability Insurance policy and the Commercial Property policy);
- **General Liability Insurance** – Travelers (covers premises and operations liability);
- **Commercial Property** – Travelers (covers business physical assets);
- **Commercial Umbrella** – Travelers (extends coverage of underlying commercial package and commercial property policies);
- **Automobile Insurance** – Travelers (covers company vehicles);
- **Management Liability** – Hartford (covers potential EPLI and Crime management liability); and
- **Management Liability** – Great American (covers D&O and fiduciary liability).

*Facts Supporting Cash Collateral Motion*

26. Pursuant to the applicable Bankruptcy Rules and Local Rules, the Debtor makes the following disclosures regarding the relief sought in this Motion:

| Requirement | Disclosure |
| --- | --- |
| Name of each entity that may assert a potential interest in Cash Collateral | Cambridge Savings Bank and the Small Business Administration (the "**SBA**" and, with Cambridge Savings Bank, the "**Prepetition Lienholders**") may assert an interest in the Cash Collateral of the Debtor. |
| Purpose for use of Cash Collateral | Use of Cash Collateral is necessary to avoid harm to the Debtor and its estate because, without the use of Cash Collateral, the Debtor will not have the funds necessary to maintain its assets, to operate its business in the ordinary course, to provide financial information, to pay professionals, and to pay other expenses necessary to maximize the value of the Debtor's estate in chapter 11. |
| Modification of Automatic Stay | The Interim Order does not contain any modification of the automatic stay. |
| Material terms, including duration of the use of Cash Collateral | The Debtor shall be authorized to use Cash Collateral in accordance with the budget attached to the proposed Interim Order as **Exhibit A** and subsequent budgets to be filed at later dates in the chapter 11 case (the "**Budget**"). The Debtor's use of Cash Collateral shall be conditioned upon the Debtor's compliance with the Budget, with the understanding that the timing of revenue and expenses may vary from projections, except that the Debtor's aggregate |

8

| | |
|---|---|
| | disbursements shall be limited to 125 percent (125%) of projected aggregate disbursements in the Budget. |
| Liens, cash payments, or other adequate protection to be provided to each entity with an interest in Cash Collateral | To the extent the Prepetition Lienholders are entitled to adequate protection for the Debtor's use of Cash Collateral, and solely to the extent of any diminution in the value of such interest in Cash Collateral from and after the Petition Date as to the Debtor (if any), the Prepetition Lienholders shall be provided with the following adequate protection:<br><br>(i) Through an increase in Cash Collateral from the Petition Date during the relevant time period and the use of Cash Collateral to maintain and preserve their secured interests;<br><br>(ii) Through the Adequate Protection Liens and Continuing Liens (each as defined below); and<br><br>(iii) To the extent the Adequate Protection Liens and Continuing Liens are insufficient to cover the Adequate Protection Obligations (defined below) in their entirety, the remaining, unsatisfied Adequate Protection Obligations shall constitute allowed administrative claims against the Debtor to the extent provided by § 507(b) of the Bankruptcy Code. |
| Proposed budget | The initial Budget is attached to the proposed Interim Order as **Exhibit A**. |
| Estimated claim amounts for the parties with potential interest in Cash Collateral | Cambridge Savings Bank: **$1,500,000.00** (approximately)<br>SBA: **$1,900,000.00** (approximately) |

27. Based on its review of its records and financing statements filed with the Maine Secretary of State, the Debtor believes that the following parties may assert an interest in Cash Collateral as of the Petition Date:

28. **Cambridge Savings Bank**. On or around October 7, 2022, the Debtor and Cambridge Savings Bank entered into an agreement wherein Cambridge Savings Bank agreed to lend to the Debtor the principal sum of up to **$4,000,000.00** under a revolving line of credit facility. To secure the obligations owed by the Debtor to Cambridge Savings Bank, the Debtor granted Cambridge Savings Bank, among other interests and collateral, a lien on all now existing and

9

hereafter acquired assets and properties of Debtor, together with all proceeds and products of the foregoing. To perfect its interests, Cambridge Savings Bank filed a UCC Financing Statement on October 7, 2022.

29. **SBA**. On or around May 19, 2020, the Debtor and the SBA entered into an agreement wherein the SBA agreed to lend to the Debtor the principal sum of **$2,000,000.00**. To secure the obligations owed by the Debtor to the SBA, the Debtor granted the SBA, among other interests and collateral, a lien on all tangible and intangible personal property of the Debtor, as well as all proceeds thereof. To perfect its interests, the SBA filed a UCC Financing Statement on June 1, 2020, and a continuation filing on May 23, 2025. The SBA has subordinated its interests to those of Cambridge Savings Bank.

30. The Debtor seeks interim authority to use Cash Collateral to fund necessary expenses in the early weeks of the case, including payroll, supplies and inventory, utilities, and other ordinary operating expenses as set forth in the Budget. Access to the use of Cash Collateral both short- and long-term is necessary for the Debtor to fund required expenses during the chapter 11 case, as described in the Budget, which the Debtor believes will preserve and maximize the going-concern value of the estate for the benefit of all parties. Other than Cash Collateral, the Debtor does not have access to funds and would be unable to pay these necessary expenses. Accordingly, access to and use of Cash Collateral will provide the Debtor with the liquidity necessary to ensure that the Debtor has sufficient working capital and can meet its obligations as a debtor-in-possession in the case.

31. The inability to use Cash Collateral, on the other hand, would mean that the Debtor's business operations would have to cease, be subject to liquidation in bankruptcy or a state court proceedings, or the business would need to be placed into a receivership under applicable

state law. Any of these outcomes would cause substantial harm to the Debtor and limit potential recoveries to creditors. This would cause irreparable harm, not only to the Prepetition Lienholders, but also to the value of the Debtor's business, including as a going concern.

32. The Debtor seeks authority to use Cash Collateral on an interim and then final basis, and as reflected in the Budget, which I have also reviewed and confirm, at least during the interim period the ending balance of Cash Collateral equals or exceeds the beginning balance on the Petition Date. The Debtor's proposed use of Cash Collateral will preserve the value of Cash Collateral during the interim period (at the very least) and avoid immediate and irreparable harm to the Debtor and its estate. In light of this, to the extent the Prepetition Lienholders hold valid, perfected, and unavoidable interests in Cash Collateral of the Debtor, the Prepetition Lienholders' interests are being adequately protected without providing any additional form of relief during the interim period.

33. Beyond the interim period, the Prepetition Lienholders' security will be further adequately protected by improvements in the nature of collateral premised on inventory being converted to cash, as well as by the general over-secured nature of the Prepetition Lienholders' claims.

*Facts Supporting the Critical Vendor Motion*

34. The Debtor, in the ordinary course of business, works closely with the Critical Vendors, which are critical to the Debtor's ongoing business. The Critical Vendors are indispensable to the Debtor's operations because they facilitate and allow credit card purchases and payments in the Debtor's various physical stores, as well as online, which credit card purchases account for approximately 95% of the Debtor's total sales.

35. The Critical Vendors are the Debtor's credit card processors, and their services facilitate and allow credit card purchases in the Debtor's various physical stores, as well as online, in exchange for a small percentage of the charge amount of the purchase in question. As a result, the anticipated Critical Vendors' Claims of the Critical Vendors will be service fees for credit card payments prepetition that, once processed, will provide necessary revenue to the Debtor postpetition. In fact, for approximately every 5 cents in charges incurred with the Critical Vendors for processing fees, the Debtor generates revenue of the remaining 95 cents, and without the Critical Vendors' services, the Debtor's customers would not be able to purchase in-store or online with credit cards. The Debtor's business, therefore, would immediately collapse, and revenue would plummet overnight, to the catastrophic detriment of the Debtor, its creditors, and any chance of a successful reorganization.

36. Finally, given the existing relationships with these Critical Vendors and the overall market for such services, there are limited options available to process credit card payments, and the services provided by the Critical Vendors are, in the Debtor's opinion, optimal among available options.

37. As of the Petition Date, due to the timing of services and invoicing, the Critical Vendors hold Critical Vendors' Claims in the total estimated amount of not more than $65,000 for sales that occurred in the days before the chapter 11 filing. Although the Debtor may receive services from the Critical Vendors postpetition for a limited period of time, the Critical Vendors will likely cease providing further service to the Debtor unless the Critical Vendors Claims are paid in full. The loss of services from the Critical Vendors would disrupt (and effectively halt) the Debtor's postpetition revenue, cash flow, and chapter 11 strategy, as well as cause reputational

harm to the Debtor when the Debtor is unable to accept credit card payments following a public bankruptcy.

38. Such harm from this disruption would far outweigh the relatively minimal cost of payment of the Critical Vendors' Claims accrued in the ordinary course of business.  Moreover, the Debtor believes that jeopardizing its relationship with the Critical Vendors, and attempting to procure the services from replacement vendors, is not feasible in the timeframe required given the general lack of comparable service providers, would impose a severe strain on the Debtor's business operations and administrative team, and would result in significant revenue loss.  Even a temporary interruption of those services would impede the Debtor's operations, and the cumulative impact of such events would have a catastrophically adverse effect on the Debtor's business.

*Facts Supporting Customer Program Motion*

39. The Debtor utilizes various customer programs, promotions and practices (collectively, the "**Customer Programs**") designed to enhance revenues by, among other things, encouraging repeat business and developing new customer relationships in the Debtor's business. As of the Petition Date, the Customer Programs include the following (a) the Gift Card Program; (b) the Discounts and Seasonal Promotions; (c) the Customer Rewards Program; and (d) the Refund Policies (each term as defined below).

40. The Debtor believes that it is critically important to maintain its brand, goodwill, and customer loyalty by continuing to administer the Customer Programs in the ordinary course of business and to honor related prepetition obligations.  In connection with this chapter 11 case, the Debtor is seeking to reorganize its operations, and the viability of the reorganized the Debtor will depend in substantial part on the Debtor's ability to preserve its goodwill, retain current

13

customers, and develop new business. If the Debtor is unable to honor Customer Program obligations, the Debtor's brand will be immediately and irreparably harmed.

41. Continued use of the Customer Programs, on the other hand, will enable the Debtor to protect its customer base and revenue growth opportunities. Moreover, despite the importance of the Customer Programs to the Debtor's marketing strategy, the impact of the Customer Programs—almost all of which is in the form of non-cash discounts and promotions—is not significant in comparison to the Debtor's total revenues. Consequently, the Debtor seeks the authority to maintain and administer the Customer Programs in the ordinary course of business.

42. The Debtor runs an active gift card selling and honoring program (the "**Gift Card Program**"), which encourages and allows current and potential future customers to purchase pre-paid gift cards for themselves and their friends, families, and colleagues. The Gift Card Program is particularly important this time of year, as customers and potential customers give or receive gift cards to shop at the Debtor's stores as holiday presents and other end-of-year gifts. Any cessation of the Debtor's ability to honor and continue its Gift Card Program at this time of year, coupled with a recent bankruptcy filing, would spell certain doom to the Debtor's customer goodwill and negatively impact its efforts to successfully reorganize. Given the importance of this issue, the Debtor's initial outreach to customers post-petition will specifically include reference to this Motion and honoring all gift card commitments during this case.[4]

43. The Debtor also regularly runs discounts and seasonal promotions (collectively, the "**Discounts and Seasonal Promotions**"), such as the following:

---

[4] As of the Petition Date, the Debtor estimates that it has approximately $715,000 in outstanding gift card balances.



44. The Discounts and Seasonal Promotions are specifically intended to generate additional revenue notwithstanding the concession of a discount, including by encouraging more sales and customer loyalty. Although some of the Discounts and Seasonal Promotions may technically pre-date the Petition Date, the Debtor seeks to honor any promotions and discounts (and related obligations) for the same goodwill preservations purposes as discussed above.

45. The Debtor also runs a standard rewards program for customers (the "**Customer Rewards Program**"), which allows customers to benefit from repeat visits and multiple purchases through discounts on the Debtor's products in the form of rewards credits and other benefits. The Debtor has approximately 120,000 rewards members. For the same reasons discussed above, maintenance and honoring of the Customer Rewards Program will serve to preserve customer goodwill at a time of critical transition for the Debtor. But perhaps more fundamentally, the Customer Rewards Program serves to benefit the Debtor by encouraging repeat customers and increasing net revenue that far offsets the cost of maintaining the program. This is "win-win" scenario for the customers and the Debtor, and continuation of the Customer Rewards Program will benefit the Debtor, its customers, its creditors, and the chances of a successful reorganization. Accordingly, the Debtor seeks to maintain the Customer Rewards Program and honor all obligations arising therefrom, including any prepetition credits, rewards, points, or other obligations.

46. The Debtor also runs industry standard return and refund policies (the "**Refund Policies**") that allow customers to return products and receive a credit or refund (depending on

circumstances), which may give rise to a prepetition obligation of the Debtor to that customer. The Refund Policies foster customer goodwill and repeat business, as the ability to return products gives customers the confidence to purchase them in the first instance. The benefits of the program again far outweigh the costs, and certainly outweigh the damage their cessation would cause to the Debtor's business and prospects for reorganization. Accordingly, the Debtor seeks to maintain the Refund Policies and honor all obligations arising therefrom.[5]

*Facts Supporting Emergency Hearing Request*

47.   The Debtor seeks an expedited hearing and determination as to the First Day Motions due to the time-pressing nature of the relief requested therein as set forth at length in those Motions. I have reviewed and confirmed the accuracy of those reasons necessitating emergency relief.

Further the affiant sayeth not.

Dated: December 21, 2025                    */s/ Glenn L. Davis*
                                            Glenn L. Davis
                                            Chief Financial Officer of Debtor

---

[5] As an indication of its strong product offerings and customer relationships, the Debtor enjoys relatively minimal returns in the ordinary course, representing only approximately 1-1.5% of all sales.